## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MARY HIERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  04-3127 |
| | ) | |
| ABRAHAM LINCOLN | ) | |
| MEMORIAL HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Abraham Lincoln Memorial Hospital's (Hospital) Motion for Summary Judgment (d/e 18). Plaintiff Mary Hierman worked for the Hospital for 29 years, from 1974 until July 14, 2003, when she was terminated from her employment. Hierman claims that the Hospital terminated her because of her age (Count I) and her gender (Count II) in violation of the Age Discrimination in Employment Act (ADEA) and Title VII of the Civil Rights Act 1964 (Title VII).  29 U.S.C. § 621 <u>et</u> <u>seq</u>.; 42 U.S.C. § 2000e <u>et</u> <u>seq</u>.  Issues of fact exist regarding Hierman's age discrimination claim, but not her sex

1

discrimination claim.  Therefore, the Motion for Summary Judgment is allowed in part and denied in part.

## STATEMENT OF FACTS

Hierman was born on July 10, 1952.  She began working for the Hospital in 1974.  At the time she joined the Hospital, Hierman had completed some college courses, but did not have a bachelor's degree.  In 1986, she became the Patient Accounts Manager.  She worked in that position until her termination on July 14, 2003.

Hierman managed a staff of six to eight people.  The primary function of Hierman's department was to bill and collect for services rendered from insurance companies, other third party providers, and patients.  The Medical Records Department entered codes into the Hospital's computer system for each service rendered.  Once the services were coded, Hierman's department sent the bills, either electronically or by mail, depending on the party billed.  Hierman's department then was responsible for collecting the billings.  In early 2003, an average of approximately 80 days passed from the time that services were rendered until the Hospital was paid.  This period of time was referred to as "days in accounts receivable" or "days in AR."

In February 2003, the Hospital hired Mark Aldridge as its new Chief Financial Officer (CFO).  Hierman reported to Aldridge.  Bruce Allen, the Accounting Manager and Peggy Routson, the Material Services Manager also reported to Aldridge.  Bruce Allen managed a staff of approximately four people.  He was a certified public accountant (CPA).  During his tenure at the Hospital, his title changed from time to time from Accounting Manager to Comptroller.  <u>Defendant's Motion for Summary Judgment (d/e 18)(Defendant's Motion), Appendix</u>, Exhibit D, <u>Bruce Allen Deposition</u> at 9.  His office handled accounting functions for the Hospital, including accounts payable.  <u>Bruce Allen Deposition</u> at 13.

One of Aldridge's goals was to reduce the Hospital's days in AR.  He wanted the days in AR to be reduced to 50 days or less.  Aldridge made many requests to Hierman to try to achieve this goal.  He made many requests regarding following up on patient accounts.  Hierman told him that she would implement each of his requests, and her department did so.  <u>Mary Hierman's Amended Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (d/e 25)</u>, <u>Additional Statement of</u>

<u>Undisputed Facts (Hierman SUF)</u>, ¶ 65.[1]  Aldridge wanted Hierman's staff to call insurance carriers and ask for the date that each check would be cut and the amount for which each check would be written; the staff members were also to record the names of each person to whom they spoke so that if a check did not come in, they could call back and speak to the same person.  Hierman told Aldridge that insurance representatives may not be able to answer these questions, but her staff would attempt to get this information.  Aldridge seemed quite pleased with the progress that Hierman and her staff were making.  <u>Id.</u>

Aldridge requested that Hierman's staff telephone insurance companies within seven days of a patient's discharge.  Hierman told Aldridge that her staff would do so, but in some circumstances insurance companies may not have the bill within seven days.  For example, a carrier might not receive the bill within seven days of discharge if the bill was mailed rather than submitted electronically.  Also, bills could not be sent

_____

[1]The Court references only statements of fact that the other party concedes are undisputed.  If the parties have any partial disagreement with any particular statement of fact, the Court will note the disagreement.  The Hospital stated that it does not dispute virtually all of the Hierman's additional statements of fact.  <u>Defendant's Reply in Support of its Motion for Summary Judgment (d/e 28)(Reply)</u> at 2-5.  The Hospital states that it views many of these statements to be immaterial, but does not explain the reasons for that position, as required by the Local Rules.  <u>Local Rule</u> 7.1(D)(3)(a)(3).  The statements referenced by the Court are material.

until Medical Records completed coding the charges.  A delay in coding could delay transmission of the bill to a carrier.  Hierman stated that she would follow through with his requests and did so.  Aldridge also requested that Hierman institute a second collection agency, and this was taken care of as well.  Hierman SUF, ¶¶ 65, 77.

Aldridge wanted the Hospital to collect co-payments from patients at the time of service.  Hierman agreed with this approach.  Representatives of the emergency room, however, expressed concern that collecting co-payments at the point of service would increase congestion in the emergency room.  Hierman suggested stamping registration forms of emergency room patients and having the nurse direct patients back to the registrar to make co-payments after being treated.   Aldridge complimented her on the suggestion.  Hierman SUF, ¶ 66.

At the time Aldridge came to the Hospital, Hierman's regular hours were from 6:00 a.m. to 3:30 p.m.  Aldridge asked Hierman to change her schedule so that she would work until 4:30 p.m.  Hierman immediately changed her regular hours to 6:30 a.m. to 4:30 p.m., with a half-hour for lunch.  Hierman also often worked evenings and weekends.  She worked between 50 to 60 hours per week during the time that Aldridge was the

CFO.  Hierman SUF, ¶ 67-68.

Hierman received 23 vacation days, or paid time off (PTO), annually. The Hospital had a policy that a manager, such as Hierman, was required to take PTO if she took off four hours or more in a day.  Hierman SUF, ¶ 19.  Otherwise, managers were allowed to take off smaller increments of time and make up the missed time later during the same week.  On April 29, 2003, Aldridge told Hierman that she could no longer follow Hospital policy and had to use PTO for any time off.  Hierman complied with his request. Hierman took PTO a total of five times in 2003.  Aldridge approved all of this time off.  Hierman SUF, ¶¶ 19, 70.

Hierman states in her deposition that she became disgruntled or "flustrated" with Aldridge because, at times, he would tell her to do one thing, and after she accomplished the task, he would change his mind and tell her to perform the task differently. Defendant's Motion, Appendix, Exhibit A, Hierman Deposition at 56-57.  According to Hierman, Aldridge also raised his voice to her, stomped down the halls in the accounting area, slammed his hand on desks or slammed desk drawers.  Hierman SUF, ¶ 73; Hierman Deposition at 58.  Hierman's tone and demeanor toward Aldridge, however, was always professional.  At no time did Hierman ever roll her eyes

at Aldridge, nor did she raise her voice to him or yell at him.  Similarly, she never told Aldridge to "do whatever you want" or anything to that effect. Hierman never indicated that she was not willing to follow his orders.  Every request Aldridge made to Hierman was performed, with the possible exception of initially challenging his direction to modify her vacation policy discussed below.  Hierman SUF, ¶¶ 73-75.

Aldridge, however, had a meeting with Hierman in March 2003, in which he told her that he felt that she had an angry attitude.  Hierman states in her deposition that she told Aldridge that she was not angry, but she told him that, at times, she was frustrated because he would tell her one thing and then, later, change his mind and tell her to perform the task differently.  Hierman Deposition at 56-57.  He asked her if she had read the Hospital credo.  She said yes.  According to Hierman, the meeting ended on a very positive note because she told him that she would try very hard to refrain from displaying a frustrated attitude again and that she was only there for the betterment of the Hospital.  Id. at 58-59.

In May 2003, Aldridge told Hierman that he wanted managed-care accounts to be checked manually to see if they had been paid accurately. Hierman suggested developing a computer program that would produce a

spreadsheet analysis of the relevant information.  Aldridge told her that he thought that this was a great idea.  Aldridge assigned the project in late May 2003, and gave Hierman two to three months to complete the project.  Darrell Oller worked with Hierman to develop the program.  Oller worked in the Hospital's Information Technology Department.  Hierman SUF, ¶¶ 47, 78.

Hierman and Oller developed the program and made a test run.  The resulting report contained a margin of error.  Aldridge states that he told Hierman to tell Oller that they appreciated his work on the program and that there appears to be a bit more work to be done.  Aldridge says that he told her not to say that there was anything wrong with the program.  Defendant's Motion, Appendix, Exhibit B, Aldridge Deposition at 43.  Hierman remembers Aldridge telling her to contact Oller to tell him that the program needed additional work to eliminate the margin of error.  She does not remember any cautionary instructions about not telling Oller that the program had problems.  Hierman Deposition at 70-72.

Hierman talked to Oller and told him that the report was working well, but was showing a small margin of error, and they wanted to get rid of the margin of error.  Hierman Deposition at 72.  She also said that she did

not believe that Aldridge had faith in her to complete the project and asked

if he could fit her into his schedule to get the job completed.  Id. at 71-72.

Aldridge states in his deposition that Oller approached him at a golf outing

on June 27, 2005, and told him that Hierman told Oller that the program

was wrong.  Aldridge Deposition at 43.  Aldridge discussed this matter with

Hierman on July 1 or 2, 2005.  According to Hierman, Aldridge accused her

of telling Oller that Aldridge had no faith in the program.  She explained

that she told Oller that Aldridge did not have faith in her.  Id. at 76-77.

On July 2, 2003, Hierman had two meetings with Aldridge.  The first

meeting was in the morning and was attended by Hierman and Aldridge.

Aldridge told Hierman that he wanted her staff to telephone Medical

Records personnel to notify them of accounts that exceeded $5,000.00 so

Medical Records could speed the coding of the charges on those accounts.

Hierman suggested giving a list of the larger accounts to Medical Records.

Aldridge rejected this suggestion.  He wanted Hierman's staff to telephone

individuals in the Medical Records Department to give them the specific

account information immediately.  Hierman told Aldridge that she thought

this could disrupt her staff and the Medical Records' staff, but she said that

her staff would follow Aldridge's instructions.  Hierman instructed her staff

to make telephone calls to Medical Records' personnel in accordance with Aldridge's instructions. <u>Hierman Deposition</u>, ¶ 43-46; <u>Hierman SUF</u>, ¶ 80.

In the afternoon of July 2, 2005, Hierman met with Aldridge and Bruce Allen to discuss the budget for the next fiscal year which began in October. Aldridge requested Hierman to include a line item for temporary help to cover absences due to vacation and medical leaves. Hierman had never before used temporary help to cover for vacations, and never before had such a line item in the budget. She included the item in the budget at Aldridge's request. During a meeting, Aldridge said he wanted the amount for temporary employees reduced by $4,000.00. At no time in the meeting did Hierman refuse to make the change that Aldridge requested. <u>Hierman SUF</u>, ¶ 79.

Aldridge also wanted Hierman to change her vacation policy. Hierman required her staff to get prior approval before taking PTO, and she did not allow more than one employee to take PTO at the same time. <u>Hierman SUF</u>, ¶ 79. According to Hierman, Aldridge wanted her to add an additional requirement that if the vacations of any staff members were scheduled for two consecutive weeks, then no one could take vacation for the next two weeks. <u>Hierman Deposition</u> at 81. Hierman told Aldridge

that the change would work a hardship on staff members with school-age children because the policy would effectively not allow some of them to take vacation in the summer when school was out.  She told him that the staff would know that the policy came from him because he did not have children.  Hierman Deposition at 81-84.  Hierman, however, never suggested that the Hospital could deny an employee's PTO request, nor did she ever suggest that employees should be entitled to PTO without securing prior approval for the request.  Aldridge eventually dismissed Hierman from the meeting.  Id. at 87.  The next day, Hierman came back to Aldridge and apologized for her comments about the change in vacation policy and agreed to implement the new policy.  Id., Hierman SUF, ¶ 75, Reply at 5, ¶ 30.

Aldridge also reported to his superiors regarding Hierman.  Aldridge told the Chief Executive Officer of the Hospital, Forrest (Woody) Hester, that Hierman was resisting Aldridge's changes and refusing to implement them.  Aldridge told Hester that Hierman was unable to change her methods of work and supervision.  He told Hester that she allowed several members of her staff to take vacations at the same time.  Aldridge told Hester that Hierman simply would not do what he wanted her to do. Hierman SUF, ¶¶ 27-31, 33, 36.  As discussed above, Hierman, in fact,

followed all of Aldridge's directions.  She even told Aldridge that she would implement the change in the vacation policy.

Aldridge prepared a document that he says contained his notes of meetings that he had with Hierman.   He showed these notes to representatives of the Hospital's Human Resources Department.  <u>Hierman SUF</u>, ¶¶ 43-44.  The notes stated that Hierman told Aldridge she could manage her department from home using a pager.  The notes said that in the meeting in which they discussed Hierman's conversation with Oller about the managed care program, Hierman became angry in her demeanor and that she left the meeting laughing and saying "Whatever you think." <u>Aldridge Deposition</u>, Deposition Exhibit 1.  The notes from the morning meeting on July 2, 2005, stated:

> Mrs. Hierman quickly stood up walked out of the door and said in a loud rude voice, what ever you want, just what ever you want, and began laughing loudly as she left.

> We parted with Mrs. Hierman laughing and speaking in a manner that led me to believe she wanted everyone in the building to hear her disgust (speaking very loudly).

<u>Id.</u>  The notes stated that, at the afternoon meeting on July 2, 2005, Hierman was standoffish, difficult, and had a sarcastic attitude.  The notes stated:

Her particular problem was she stated she did not believe we could effect a budget reduction by enforcing a PTO policy, which would require employees to get her approval of PTO time. She stated it is not legal to deny an employee vacation time if they wanted, that I (meaning Mark Aldridge) would have to let them take it.

I told her they do own the PTO, but that they must get prior approval (from the manager) to take the PTO, and that she needs to coordinate this in an efficient manner.

She expressed that she did not believe my statements to be true and her attitude was very sarcastic.

We parted with me telling her it is her budget, that I will not make her do this, so if she feels she can not reduce her budget I would leave it alone. She stated she would reduce it, I said if you disagree with the issue I will not force you. Even after giving her what she wanted (no reduction to budget) she was still sarcastic and left smiling in a sarcastic way. We did not make a change to the budget.

Id.

The Hospital, however, does not dispute that: Hierman implemented all of Aldridge's directives (she initially objected to the new vacation policy, but the next day told Aldridge she would implement the new policy); she never said that she could manage her department from home using a pager; never raised her voice to Aldridge; never said "whatever you want;" she always used a professional tone and demeanor toward Aldridge; she always required employees to secure prior approval before taking vacation and

13

never let more than one employee take vacation at a time; and she never told Aldridge that she had to let employees take PTO whenever they wanted.  Hierman SUF, ¶¶ 69, 73, 74, 79; Reply at 5, ¶¶ 29, 33.

Aldridge then recommended that Hierman be terminated.  Hierman SUF, ¶¶ 32, 37, 45.  Hester had the authority to terminate Hierman, but Aldridge believed the ball was in his court to make the decision.  Hierman SUF, ¶¶ 38, 47.  The Hospital ultimately terminated Hierman on July 14, 2005.

Hierman was the only employee that Aldridge ever disciplined while he worked at the Hospital.  He never disciplined Bruce Allen.  Bruce Allen took time off for personal matters such as haircuts.  Hierman does not know whether he took PTO for this or not.  Hierman Deposition at 112-17.  Bruce Allen occasionally told Aldridge that he would not meet deadlines set by Aldridge.  Id.

Approximately thirty days after Hierman was terminated, Aldridge hired Kim Allen, a woman with whom he had previously worked at another hospital.  Allen was 31 or 32 years old at the time she came to the Hospital.

Defendant's Motion, Statement of Undisputed Facts (Hospital SUF), ¶ 70.[2]

## ANALYSIS

Hierman claims that she was fired from her job because of her age and gender. The Hospital asks for summary judgment on both claims. At summary judgment, the Hospital must present evidence that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to Hierman. Any doubt as to the existence of a genuine issue for trial is resolved against the Hospital. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once the Hospital has produced evidence showing that it is entitled to summary judgment, Hierman must present evidence to show that issues of fact remain. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In this case, Hierman has established that issues of fact exist regarding her claim of age discrimination, but not her sex discrimination claim.

---

[2]Allen's birth date was August 22, 1971. Hospital SUF, ¶ 70. It was unclear from the evidence whether she started before or after her 32nd birthday.

A.    <u>AGE DISCRIMINATION</u>

Hierman seeks to overcome summary judgment on her age discrimination claim through the indirect, burden shifting method of proof. Under this method, she must present evidence that would establish a <u>prima facie</u> case that: (1) she is a member of a class protected by the statute; (2) she reasonably performed her duties according to her employer's legitimate expectations; (3) she was terminated; and (4) the position remained open or she was replaced by someone substantially younger.  <u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 472 (7th Cir. 2002).  The Hospital urges the Court to use a different formulation of the <u>prima facie</u> case that requires proof of more favorable treatment of a similarly-situated younger employee. The Hospital's proposed <u>prima facie</u> case does not apply here.  The cases that use this formulation involve claims of a failure to promote, not discharge and replacement by a younger employee.  <u>See e.g.</u>, <u>Jordan v. City of Gary, Ind.</u>, 396 F.3d 825, 835 (7th Cir. 2005).

If Hierman presents evidence of a <u>prima facie</u> case, then the Hospital must state a non-discriminatory reason for discharging Hierman.  If the Hospital states a non-discriminatory reason, Hierman must then present evidence tending to show that reason is a pretext.  A stated reason is a

pretext if the evidence indicates that the stated reason is not the actual reason. <u>Rudin v. Lincoln Land Community College</u>, 420 F.3d 712, 726 (7th Cir. 2005). The Hospital argues that Hierman must also present evidence that the real reason was discriminatory. This is incorrect. The cases cited by the Hospital state the burden of proof at trial, not the burden of proof to overcome a motion for summary judgment. <u>See</u> <u>e.g.</u>, <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000). At summary judgment, the evidence does not need to indicate that the actual reason was an improper one, only that the stated reason is not true. "[O]nce the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury -- not the court." <u>Rudin</u>, 420 F.3d at 726 (quoting <u>Weisbrot v. Medical College of Wisconsin</u>, 79 F.3d 677, 781-82 (7th Cir. 1996)).

Hierman has established a <u>prima</u> <u>facie</u> case of age discrimination under the indirect method. She was a 52 years old and so was in the class protected by the ADEA. 29 U.S.C. § 631. She was discharged, and she was replaced by a substantially younger woman. She also was reasonably meeting her employer's expectations. The Hospital does not dispute that

she did everything Aldridge told her to do and never refused to do anything, with the possible exception of initially challenging the new vacation policy. Even then, she agreed to institute the policy.

The Hospital states, as its non-discriminatory reasons for her discharge, that Hierman "repeatedly failed to meet the Hospital's performance expectations: she was not a team player; she resisted change; she ignored her supervisor's directives; she failed to decrease the Hospital's days in accounts receivable; she missed deadlines; and she lacked judgment regarding the importance of a manager's presence at work." Defendant's Motion for Summary Judgment (d/e18) at 29.

Hierman has presented ample evidence to show that most of these stated reasons are not true. Hierman stated as undisputed facts, and the Hospital did not dispute, that:

1.  She followed the instructions of her supervisor, with the exception of her comments on July 2, 2003, about the new vacation policy; but, even then, she apologized and agreed to follow the instruction the next morning.

2.  She treated her supervisor in a professional manner at all times.

3.  She did not miss deadlines. The only deadline identified by the

Hospital was a deadline for the production of the spreadsheet program with Oller, but the deadline was two to three months after she received the project assignment in late May.  Hierman was discharged on July 14, 2003, less than two months after receiving the assignment.  A jury could conclude that she was never given the opportunity to meet that deadline.

4.   She was present in her office to manage her staff.  After Aldridge told her not to take time off except for PTO that he approved, she followed that instruction and only took a few days off thereafter, all with Aldridge's prior approval.

Moreover, a jury could conclude that Aldridge lied to Hester and to Human Resources to get Hierman fired.  Aldridge told Hester that Hierman would not do what he asked her to do.  He told him that she would not change.  The Hospital does not dispute facts that show that these statements are not true.  Aldridge gave Human Resources his notes of meetings that stated that Hierman was angry, hostile, sarcastic, and combative.  Again, the Hospital does not dispute facts that show that much of his statements about Hierman in those notes are not true.  From this, a jury could conclude that Aldridge fabricated his notes and lied to Hester to

get Hierman fired.

The Hospital argues that the days in AR were still not reduced.  That is true, but an employer can always find some failing in an employee's performance.  See Testerman v. EDS Technical Products Corp., 98 F.3d 297, 303 (7th Cir. 1996).  The question is whether the evidence indicates that this factor was not the real reason for the action.  When read in the light most favorable to Hierman, the evidence suggests that Aldridge fabricated "notes" of meetings and consciously lied about Hierman to secure her discharge.  Aldridge's actions call into question the sincerity of the Hospital's claim that days in AR was the real reason for Hierman's discharge.  "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation." Id. at 303.  Hierman has presented sufficient evidence to establish that the Hospital's proffered reasons are a pretext.

The Hospital also argues that Aldridge's statements are not relevant because he did not have authority to fire Hierman.  Hester retained the authority to fire Hierman.  Aldridge, however, was her direct supervisor who recommended that she be discharged and had substantial input into the

decision.  His reasons for recommending that Hierman be fired are therefore relevant to show pretext.  <u>Wallace v. SMC Pneumatics, Inc.</u>, 103 F.3d 1394, 1400 (7th Cir. 1997); <u>see</u> <u>David v. Caterpillar, Inc.</u>, 324 F.3d 851, 861 (7th Cir. 2003).  Hierman has met her burden to prevail at summary judgment on her age discrimination claim.

B.    <u>SEX DISCRIMINATION</u>

To establish a sex discrimination claim, Hierman must show: (1) she is a member of protected class; (2) she was reasonably performing her duties to meet her employer's expectations; (3) she suffered an adverse employment action; and (4) a similarly-situated man was treated more favorably than she.  <u>Peters v. Renaissance Hotel Operating Co.</u>, 307 F.3d 535, 545 (7th Cir. 2002).  She has presented evidence to establish the first three elements of her <u>prima facie</u> case:  she is a woman, she was meeting her employer's reasonable expectations, and she suffered an adverse employment action.  She, however, has failed to present evidence that a similarly-situated man was treated more favorably.

Employees are similarly-situated if they are comparable in all material respects:

"A Court must look at all the relevant factors, the number of

which depends on the context of the case."  Such factors include whether the employees "dealt with the same supervisor" and were "subject to the same standards."  It is also relevant whether the employees had comparable "education and qualifications," provided that the employer took these factors into account when making the personnel decisions in question.

Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002),

quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000)

(internal citations omitted).

Hierman claims that Bruce Allen is a similarly-situated man who was treated more favorably than she.  The problem is Hierman has presented almost no information about Bruce Allen's job.  The evidence shows that: (1) Allen is a certified public accountant; (2) he was the Accounting Manager for the Hospital; (3) he reported to the CFO; and (4) he was in charge of accounting functions for the Hospital, including accounts payable. As a CPA, Allen may have had significantly more discretion than Hierman in performing accounting functions for the Hospital.  If so, he would not be comparable to her in all material respects and so would not be similarly-situated.  Hierman has presented almost nothing about Allen's specific duties and the degree to which he could exercise his professional discretion in his position.  She has the burden to show that he is similarly-situated,

22

and the evidence is not here.  She therefore fails to make out her <u>prima</u> <u>facie</u> case of sex discrimination.

THEREFORE, the Hospital's Motion for Summary Judgment (d/e 18) is ALLOWED in part and DENIED in part.  Partial Summary Judgment is entered in favor of Abraham Lincoln Memorial Hospital and against Mary Hierman with respect to her sex discrimination claim in Count II of her Complaint.  The Motion is denied with respect to her age discrimination claim in Count I.

IT IS THEREFORE SO ORDERED.

ENTER:   September 28, 2005.

FOR THE COURT:

                    s/  Jeanne E. Scott
                    JEANNE E. SCOTT
                    UNITED STATES DISTRICT JUDGE